Argued and submitted March 4, accused suspended from the practice of law for 30 days, effective 60 days from the date of the filing of this decision May 6, 2004

In re Complaint as to the Conduct of

# MARK G. OBERT,
*Accused.*

(OSB Nos. 01-150, 01-151, 01-170; SC S50320)

89 P3d 1173

Walter J. Todd, Salem, argued the cause for the accused. Mark G. Obert, Salem, filed the brief on his own behalf.

Stacy J. Hankin, Assistant Disciplinary Counsel, Lake Oswego, argued the cause and filed the briefs for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (Bar) charged the accused lawyer, Mark G. Obert, with multiple violations of the Code of Professional Responsibility stemming from his conduct in matters involving three clients: Cooper, Crawford, and Williams. In the Cooper matter, the Bar charged the accused with violations of Disciplinary Rule (DR) 5-105(E) (representing multiple current clients whose interests conflict) and DR 6-101(B) (neglect of legal matter). In the Crawford matter, the Bar also charged the accused with a violation of DR 6-101(B), as well as a violation of DR 1-102(A)(3) (conduct involving misrepresentation) and DR 5-101(A)(1) (continued representation of client whose interests conflict with lawyer's self-interest). Finally, in the Williams matter, the Bar charged the accused with violating DR 9-101(C)(4) (failure to return client property promptly).

A trial panel of the Disciplinary Board found that the Bar had failed to prove two of the three charges in the Crawford matter, *viz.*, DR 1-102(A)(3) and DR 5-101(A)(1). The trial panel concluded, however, that the accused had violated the four remaining disciplinary rules at issue before it. The trial panel imposed a sanction of a suspension from the practice of law for 90 days, but stayed the suspension in favor of a two-year period of probation. The Bar seeks review, contending that an appropriate sanction should entail a suspension of at least six months.

On *de novo* review, ORS 9.536(2), we conclude that the accused violated DR 6-101(B), DR 5-105(E), DR 1-102(A)(3), and DR 9-101(C)(4). As a result, we suspend the accused from the practice of law for 30 days.

## I. FACTS

The accused has been an Oregon lawyer since 1996. He is a sole practitioner. In the matters that follow, the facts have been established by clear and convincing evidence.

A.  *The Cooper Matter*

In September 1999, the Coopers retained the accused to represent them in the adoption of Mrs. Cooper's son from a prior relationship. The child's birth father— Sifuentez—appeared to have abandoned the child. Although the Support Enforcement Division of the Department of Justice recently had provided Mrs. Cooper with several child support payments from Sifuentez, the Coopers had had no contact with him for two years and were unsure of his residence or mailing address.

The Coopers signed their adoption petition in November 1999. The accused filed the petition early in January 2000 and informed the Coopers of that fact shortly thereafter. Between the time of that communication and June 2000, the accused's assistant made several telephone calls to the Driver and Motor Vehicle Services Branch in unsuccessful attempts to locate Sifuentez's residence and mailing address. Aside from those telephone calls, however, the accused did little substantively to advance the Coopers' adoption during that period because, as he conceded at the trial panel hearing, he did not know what to do. Eventually, the accused stopped returning the Coopers' frequent telephone calls. As a result, the Coopers contacted the Bar for help. Thereafter, and until the accused withdrew as their lawyer, the accused's direct communications with the Coopers usually occurred only following instances of direct Bar intervention.

The accused withdrew from the Coopers' case in September 2000 when he discovered that he inadvertently had represented Sifuentez in several unrelated matters at the same time that he had been representing the Coopers. In late July 2000, a trial court had appointed the accused to represent Sifuentez in three criminal matters. Because the accused did not recognize who Sifuentez was from memory and because the accused lacked any means in his office that otherwise could have helped him identify conflicts of interest, it was not until mid-September 2000, when Mrs. Cooper discovered that Sifuentez was in jail and called the accused to

inform him of that fact, that the accused realized Sifuentez's relationship to the Coopers' adoption. The accused subsequently withdrew as the Coopers' lawyer, refunded their money, including filing fees, and referred them to another lawyer who specialized in adoptions. The Coopers' new lawyer completed the adoption shortly thereafter, and the Coopers then filed a Bar complaint regarding the accused in January 2001.

## B. *The Crawford Matter*

In December 1999, the court appointed the accused to represent Crawford in a proceeding for post-conviction relief. The post-conviction court denied Crawford's petition for relief in a judgment filed June 21, 2000, and Crawford instructed the accused to appeal. Under ORS 138.650, the accused had 30 days from that date in which to file Crawford's notice of appeal. On the thirtieth day, July 21, 2000, the accused mailed the notice, but neglected to send it by either registered or certified mail.[1] As a result, Crawford's appeal was not deemed filed until after the court received the notice three days later, on July 24, 2000. On August 23, 2000, the Court of Appeals dismissed Crawford's appeal as untimely.

Before becoming aware of the dismissal, however, the accused, at some point, had informed Crawford that work on his appellate brief was proceeding ahead of schedule. In a letter dated August 23, 2000, Crawford expressed his pleasure with the accused's progress and asked the accused to consider representing him in several other matters. Upon learning that Crawford's appeal had been dismissed, the accused failed to relay that information promptly to Crawford. Instead, the accused began legal research to ascertain whether the appeal could be reinstated. Upon concluding that it could not, the accused cut off all contact with Crawford, refusing to return his telephone calls or correspondence. At the trial panel hearing, the accused testified that

---

[1] See ORS 19.260 (for appellate purpose, filing date of appeal is date that appellant mails notice, provided appellant sends notice by registered or certified mail and subsequently files proof of mailing with court).

he was too ashamed and embarrassed at the time to admit to his client that he had failed him. It was not until January 24, 2001, five months after the Court of Appeals had dismissed Crawford's appeal, that the accused finally informed Crawford of that development. Until that time, Crawford thought that his appeal was moving forward. Shortly thereafter, the accused withdrew as Crawford's lawyer, and this Bar complaint followed.

## C. *The Williams Matter*

In March 1999, the court appointed the accused to represent Williams on appeal after the court had denied Williams's petition for post-conviction relief. The Court of Appeals subsequently affirmed the post-conviction court's judgment, and this court denied further review.

When the accused first became Williams's lawyer, Williams gave him transcripts, police reports, and briefs relating to Williams's case. In February 2001—after the Court of Appeals had issued its final judgment and the accused had forwarded it to Williams—Williams wrote the accused, asking him to return those documents. At the trial panel hearing, Williams testified that he had needed the documents to pursue a new petition for federal habeas corpus relief.

The accused admitted at the trial panel hearing that he failed to take immediate action on Williams's letter when it arrived and, as a result, had placed it in a pile of other documents and had forgotten about it. In both March and May 2001, Williams left telephone messages to the accused from prison, reiterating Williams's need for his files. The accused admitted at the hearing that, despite those reminders, he continued to forget about the documents until the end of May 2001, when he finally instructed an employee to find the stored files and return them to Williams. In the interim, however, the accused had not returned Williams's messages, and, in June 2001, Williams filed a complaint with the Bar. Shortly thereafter—and over four months after they had been requested—the accused returned Williams's papers to him.

## II. DISCUSSION

### A. *The Cooper and Williams Matters*

As a result of the accused's conduct in the Cooper matter, the Bar charged him with violations of DR 6-101(B) and DR 5-105(E). DR 6-101(B) provides:

"A lawyer shall not neglect a legal matter entrusted to the lawyer."

DR 5-105(E) provides:

"Except as provided in DR 5-105(F), a lawyer shall not represent multiple current clients in any matters when such representation would result in an actual or likely conflict."

In the Williams matter, the Bar alleged a violation of DR 9-101(C)(4). That disciplinary rule provides, in part:

"A lawyer shall:

"* * * * *

"(4)   Promptly pay or deliver to a client as requested by the client the funds, securities or other properties in the possession of the lawyer which the client is entitled to receive."

The accused concedes that he violated DR 6-101(B), DR 5-105(E), and DR 9-101(C)(4) in the course of representing the Coopers and Williams. The accused's concessions are well-taken. We find by clear and convincing evidence that the accused committed the violations noted above.

### B. *The Crawford Matter*

In the Crawford matter, the Bar charged the accused with a separate violation of DR 6-101(B), as well as violations of DR 1-102(A)(3) and DR 5-101(A)(1). As he did in the Cooper matter, the accused acknowledges that he also violated DR 6-101(B) while representing Crawford, and we again agree. We turn now to the Bar's remaining charges.

#### 1. *DR 5-101(A)(1)*

DR 5-101(A) provides, in part:

"Except with the consent of the lawyer's client after full disclosure,

"(1)    a lawyer shall not accept or continue employment if the exercise of the lawyer's professional judgment on behalf of the lawyer's client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests."

In this proceeding, the Bar contends that the accused's continued representation of Crawford by conducting legal research in hopes of rectifying the accused's filing error after the court dismissed his appeal created a conflict of interest under DR 5-101(A)(1). The Bar asserts that after the Court of Appeals had dismissed Crawford's appeal, the accused's interest and Crawford's interest necessarily diverged. The Bar argues that there was clear and convincing evidence that, in continuing to represent Crawford, the accused's professional judgment (1) actually was impaired by his own interests because he admitted that shame and embarrassment had kept him from promptly informing his client of the untimely appeal notice; and (2) potentially may have been impaired because he faced the possibility of a malpractice claim as a result of his conduct in the Crawford matter.

We agree that the accused continued to represent Crawford by searching for a way to reinstate Crawford's appeal. However, the Bar's arguments nevertheless miss the mark framed by the facts at issue here. With regard to the Bar's first argument, we agree that it is clear that the accused became paralyzed by shame and embarrassment at some point in the Crawford matter. There is nothing in the record, however, to suggest that the accused was so affected or that his interest was adverse to Crawford's interest when the accused was searching for a way to rectify his mistake. And, after the accused ascertained that Crawford's appeal could not be reinstated, there is no evidence that the accused performed any further work for Crawford or reasonably could have anticipated doing so. As a result, there is no evidence that the accused's professional judgment actually was impaired while representing his client.

The Bar's second argument similarly misses the mark. Pointing to the exercise of professional judgment that "reasonably may be affected by the lawyer's own * * * personal interests," the Bar argues that the potential for impaired judgment always accompanies the prospect of a malpractice claim. According to the Bar, when that prospect surfaces as the result of a lawyer's mistake or misconduct, the lawyer's malpractice automatically invokes the DR 5-101 requirements of full disclosure and client consent before the lawyer can accept or continue employment. That argument, however, ignores the fact that, in such scenarios, the potential for impaired professional judgment must be reasonable under the wording of DR 5-101(A). Here, after the accused concluded that he could not rectify his mistake, and after his interests arguably began to diverge from those of his client, there is no evidence that the accused performed any further work for Crawford or reasonably could have anticipated doing so. Under those facts, it is not reasonable to conclude that the accused's professional judgment may have been impaired in continuing employment as Crawford's lawyer. We conclude that the Bar has failed to prove by clear and convincing evidence that the accused violated DR 5-101(A)(1).

### 2. *DR 1-102(A)(3)*

DR 1-102(A) provides, in part:

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) Engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]"

As this court noted in *In re Starr*, 326 Or 328, 342, 952 P2d 1017 (1998), dishonesty, fraud, deceit, and misrepresentation are not identical concepts. Fraud and deceit, for example, require, among other things, "a false representation to another, with the intent that the other act upon the false representation to his or her damage." *Id.* at 342-43. Dishonesty is conduct indicating a disposition to "lie, cheat or defraud." *Id.* at 343.

A misrepresentation, in contrast, is unique in several ways. For example, it need not be driven by an improper

motive. *In re McKee*, 316 Or 114, 125, 849 P2d 509 (1993). Neither does it require an intent to deceive or commit fraud. *In re Williams*, 314 Or 530, 537, 840 P2d 1280 (1992). A misrepresentation can be, as alleged here, simply an omission of fact that is knowing, false, and material in the sense that, had it been disclosed, the omitted fact would or could have influenced significantly the hearer's decision-making process, *In re Eadie*, 333 Or 42, 53, 36 P3d 468 (2001), or conduct, *In re Gatti*, 330 Or 517, 527-28, 8 P3d 966 (2000). This court has held that "a lawyer's failure to correct a false impression made by an unintentional misstatement" is a misrepresentation, *In re Boardman*, 312 Or 452, 457, 822 P2d 709 (1991), as is the failure "to correct a representation that, although true when made, is no longer true in the light of information later acquired." *Williams*, 314 Or at 536.

This proceeding illustrates how other material omissions beyond those that *Eadie* and *Gatti* identified, also can violate the rule. Here, for example, the accused's failure to disclose the dismissal of his client's case, when that case provided the basis for the lawyer-client relationship, was material, regardless of the reason behind the dismissal. A lawyer-client relationship is a fiduciary relationship. *In re Brown*, 326 Or 582, 601, 956 P2d 188 (1998). This court subsequently explained in *In re Kimmell*, 332 Or 480, 31 P3d 414 (2001), that one acts in a fiduciary capacity

> "when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, *as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other part.*"

*Id.* at 491 n 9 (quoting *Black's Law Dictionary* 625 (6th ed 1990) (emphasis added)). It follows, we think, that a lawyer effectively jettisons his or her fiduciary responsibility to safeguard a client's confidence and trust when the lawyer knowingly withholds from a client the all-critical fact that the court has spoken and the client's case is over.

That scenario accurately describes the accused's actions in the Crawford matter. The record demonstrates that, before the Court of Appeals had ordered Crawford's

appeal dismissed, the accused had informed Crawford that his appellate brief was proceeding ahead of schedule. Although that may have been true at the time, ultimately that schedule, as well as the brief itself, both became irrelevant as a result of the accused's filing error. Thereafter, once he determined that Crawford's appeal could not be reinstated, the accused had a duty to tell Crawford that his case was over. Instead, the accused shunned that duty for approximately five months. As a result, we find by clear and convincing evidence that the accused violated DR 1-102(A)(3).

## III.  SANCTION

On review, the Bar argues that this court should suspend the accused for at least six months. The accused argues that the appropriate sanction for his actions should be a public reprimand or, alternatively, the two-year probationary period that the trial panel imposed.

■■    In determining the appropriate sanction for lawyer misconduct, "we recognize that the purpose of sanctions is not to penalize the accused, but rather to protect the public and the integrity of the legal profession." *In re Glass*, 308 Or 297, 304, 779 P2d 612 (1989). In formulating a sanction, this court takes guidance from the American Bar Association's Standards for Imposing Lawyer Sanctions (1991) (amended 1992) (ABA Standards), as well as its own cases. *See In re Eakin*, 334 Or 238, 257, 48 P3d 147 (2002) (stating principle). Our methodology is first to estimate preliminarily a sanction by focusing on (1) the duty violated; (2) the accused's mental state; and (3) the actual or potential injury involved. *Id.* "We then examine any aggravating or mitigating circumstances to determine if the sanction should be adjusted." *Id.* Finally, we review and compare the sanctions imposed in other Oregon cases to determine a final sanction for the proceeding at hand. *Id.*

A.  *Preliminary Analysis*

1.  *Duties Violated*

■    Under the ABA Standards, the accused's actions in the matters described above violated four distinct standards of conduct. In the Cooper matter, the accused violated his

duty to avoid conflicts of interest, ABA Standard 4.3, by representing the Coopers and Sifuentez at the same time in unrelated matters. The accused also violated his duty to represent his clients diligently under ABA Standard 4.4 when he allowed the Coopers' adoption case to languish and then refused to take their telephone calls or return their messages.

In the Crawford matter, the accused agrees that he violated his duty to represent his client diligently. The accused then violated his duty of candor, ABA Standard 4.6, by waiting five months to inform Crawford that his case had ended.

In the Williams matter, the accused violated ABA Standard 4.1 by failing to return Williams's property promptly when asked to do so.

### 2. *Mental State*

The ABA Standards define the mental state of "knowledge" as the conscious awareness of the nature or attendant circumstances of particular conduct, but without the conscious objective or purpose to accomplish a particular result. ABA Standards at 7. "Negligence," in turn, is "the failure of a lawyer to heed a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." *Id.*

In the Cooper matter, the accused negligently failed to advance the Coopers' adoption case and then knowingly failed to maintain contact with his clients as they began to inquire as to its progress. He also negligently represented Sifuentez at the same time that he represented the Coopers.

In the Crawford matter, the accused negligently failed to file a timely notice of appeal. Thereafter, he knowingly waited five months before informing Crawford of that fact.

In the Williams matter, the accused failed to act on Williams's file request in a timely manner and continued to forget about its return until finally delegating that task to an employee. As a result, the accused negligently failed to return the file to Williams for approximately four months.

### 3. *Injury*

Under the ABA Standards, the actionable injuries that a lawyer's professional misconduct create may be either actual or potential. In the Cooper matter, the accused injured the Coopers by delaying their adoption and by failing to maintain contact with them. *See, e.g., In re Arbuckle*, 308 Or 135, 140 775 P2d 832 (1989) (injury to client in lawyer disciplinary case measured in terms of "time, anxiety, and aggravation" spent in trying to coax cooperation from accused lawyer). The Coopers and Sifuentez also were subject to the potential for injury as adverse parties who were represented simultaneously by the accused in separate matters.

In the Crawford matter, Crawford sustained actual injury as a result of the accused's failure to file a timely appeal notice. Crawford lost the opportunity to pursue his claims in an appellate court. The accused's failure also effectively eliminated Crawford's opportunity to pursue federal habeas corpus relief, because he had failed to exhaust state remedies. 28 USC § 2254(b)(1)(A). "Exhaustion," in that context, means that the state's highest court must have been provided with a fair opportunity to rule on the merits of the claims. *Picard v. Connor*, 404 US 270, 275-76, 92 S Ct 509, 30 L Ed 2d 438 (1971). *See also Coleman v. Thompson*, 501 US 722, 755-57, 111 S Ct 2546, 115 L Ed 2d 640 (1991) (because there is no constitutional right to appointed counsel in post-conviction proceedings, lawyer's failure to file timely notice of appeal from post-conviction judgment is not cause to excuse petitioner's failure to exhaust state remedies).

In the Williams matter, the accused created the potential for injury by delaying the return of Williams's legal materials. As Williams had made clear to the accused, Williams needed his file to complete his federal habeas corpus petition. When the accused failed to produce those materials promptly, Williams lost valuable time that could have hindered the completion of his habeas corpus petition.

### 4. *Preliminary Sanction Under ABA Standards*

As noted above, the accused negligently violated his duty to avoid conflicts of interest in the Cooper matter. The ABA Standards suggest that a reprimand is the appropriate

sanction for that conduct. *See* ABA Standard 4.33 (reprimand appropriate when lawyer negligently determines whether representation will affect another client adversely and thereby creates potential for injury). In both the Cooper and Crawford matters, the accused also violated his duty of diligence. The ABA Standards suggest that suspension is the appropriate sanction in those cases. *See* ABA Standard 4.42 (suspension generally appropriate when lawyer engages in pattern of neglect and causes injury or potential injury to client).

The accused knowingly violated his duty of candor in the Crawford matter. The ABA Standard that is most applicable under those facts suggests that suspension is the appropriate sanction. *See* ABA Standard 4.62 (suspension generally appropriate when lawyer knowingly deceives client and causes injury).

In the Williams matter, the accused was negligent in dealing with his client's property. The ABA Standards suggest that a reprimand is the appropriate sanction. *See* ABA Standard 4.13 (reprimand generally appropriate when lawyer is negligent in dealing with client property and creates potential for injury).

Our preliminary analysis under the ABA Standards leans toward suspension as the potentially appropriate sanction in this proceeding. We now examine the aggravating and mitigating factors present here, as well as Oregon case law, to arrive at a final sanction.

## B. *Aggravating and Mitigating Factors*

"[A]ggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed." ABA Standard 9.21. Three are present here. First, the accused engaged in a pattern of misconduct, ABA Standard 9.22 (c), by knowingly avoiding communication with different clients on a number of different occasions. The accused also committed multiple offenses. ABA Standard 9.22(d). Finally, the accused's misconduct in the Crawford case involved a vulnerable victim. ABA Standard 9.22(h). Because Crawford was incarcerated, he had no ability to travel to the accused's office to obtain a direct

answer to his inquires, but had to rely solely on mail and the telephone.

In contrast, mitigating factors are "any considerations or factors that may justify a reduction in the degree of discipline to be imposed." ABA Standard 9.31. A number are present in this proceeding: (1) absence of a prior disciplinary record; (2) absence of a dishonest or selfish motive; (3) timely good faith effort to make restitution in the Cooper matter; (4) full and free disclosure to the Disciplinary Board and cooperative attitude; (5) good character or reputation; and (6) remorse. *See* ABA Standards 9.32(a), (b), (d), (e), (g), (l) (listing factors that may be considered in mitigation).

## C.  *Oregon Cases*

In this instance, only one Oregon case presents a factual scenario that is even roughly analogous to the one before us now, particularly when the accused's case is framed within the violations that could result in his suspension from the practice of law.

In *In re Butler*, 324 Or 69, 921 P2d 401 (1996), an experienced lawyer was retained to represent a client in a personal injury action. Although the lawyer filed a timely claim on his client's behalf, the lawyer failed to perfect service on the defendant and failed to correct that error when the trial court notified him of it. As a result, the trial court subsequently dismissed the matter with prejudice. *Id.* at 71-72. The lawyer, however, continued to assure his client that he was moving forward on the case, while trying to find a way to reinstate the action. The lawyer never informed his client that the court had dismissed his case. *Id.* at 72. In the disciplinary action that followed, the lawyer conceded that he both had neglected a legal matter entrusted to him by his client and had engaged in conduct involving dishonesty, fraud, deceit, or misrepresentation. *Id.* Ultimately, this court suspended the lawyer from the practice of law for one year.

## D.  *Appropriate Sanction*

Based on the foregoing review of *Butler* and the ABA Standards, we likewise conclude that suspension is appropriate. The totality of the accused's actions in the Crawford matter effectively deprived Crawford of the very

access to justice that lawyers are hired or appointed to secure for their clients.

It is important to recognize, however, that several factors that are not present in this case weighed heavily in formulating the length of the sanction that this court imposed in *Butler*. There, this court found that the accused lawyer "knowingly" had failed to perfect service on the defendant and then acted with "intent" to hide that fact from his client. *Id.* at 73. Second, this court recognized the lawyer's substantial experience in the practice of law. *Id.* And, finally, this court found that the lawyer had engaged in a 10-year pattern of similar misconduct. *Id.* at 76.

In contrast, we find no evidence here that the accused acted with the same disregard for professional responsibility exhibited by the lawyer in *Butler*: (1) the accused did not act with a dishonest intent in the matters at issue; (2) he has no prior disciplinary record; (3) he enjoys a reputation for good character among his colleagues; (4) he also has made restitution when he could; and (5) he has cooperated fully with the Bar and the Disciplinary Board. In light of those considerations, we conclude that a 30-day suspension is appropriate in this instance.

■ In imposing the foregoing sanction, we are aware that the trial panel stayed the accused's initial 90-day suspension in favor of a lengthy period of probation. Although we concur with the trial panel's implicit recognition that a 90-day suspension was not warranted here, this court has not, as a general matter, utilized probation as an alternative to other forms of sanction. Indeed, this court rarely, if ever, imposes a probationary sanction in a disciplinary case that was litigated before it. It is true that the Bar Rules of Procedure allow the imposition of probation, *see* BR 6.2, and this court has approved a sanction of probation from time to time in connection with stipulations for discipline. Those stipulations, however, arise under circumstances that are different from cases actually litigated before the court. In the former category, many factors of which this court has been unaware may have contributed to the sanction of probation. In the latter category, by contrast, all the relevant factors are in the record before the court. For the purposes of this and future

disciplinary cases that are appealed to this court, we advise the Bar that we do not favor probationary terms unless they are the result of a stipulation. When a lawyer's misconduct is sufficiently serious to warrant a lengthy probationary period, the uncertainties of the monitoring process lead us to prefer, when appropriate, imposition of a sanction involving a concrete period of suspension.

The accused is suspended from the practice of law for 30 days, effective 60 days from the date of the filing of this decision.